Judge Pauley

ABELMAN, FRAYNE & SCHWAB
Jeffrey A. Schwab (JS 9592)
Richard L. Crisona (RC 2203)
666 Third Avenue
New York, New York 10017
(212) 949-9022

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MONEX FINANCIAL SERVICES LTD., an Irish corporation, and PLANET PAYMENT, INC., a Delaware corporation,

                 Plaintiff,

-against-

NOVA INFORMATION SYSTEMS, INC., a Georgia corporation,

                 Defendant.

07 Civ. _____

COMPLAINT

JURY TRIAL DEMANDED

JUN 2 0 2007

    Plaintiffs Monex Financial Services Ltd. and Planet Payment, Inc. (collectively, "Planet/Monex"), by their undersigned attorneys, state for their Complaint, upon knowledge with respect to their own acts and upon information and belief with respect to all other matters, as follows:

    1. This is an action for breach of contract arising from Planet/Monex's contractual relationship and business dealings with Global Card Services, Inc. ("GCS"), the assets of which have been acquired by defendant Nova Information Systems, Inc. ("Nova").

    2. Planet/Monex entered into a December 10, 2001 Teaming Agreement with the apparently now-dissolved GCS (the "Teaming Agreement") under which the parties were to cooperatively market Planet/Monex's Dynamic Currency Conversion ("DCC") services to GCS's customers. Nova acquired the assets of GCS in a transaction completed in March 2006,

and under a Consent to Assignment and Assumption of Obligation executed by Nova on May 5, 2006, Nova "accept[ed] assignment of all of GCS's rights and obligations under the agreement and will assume all of the duties and obligations associated with the Teaming Agreement."

3. Under the Teaming Agreement, GCS and Planet/Monex were to cooperatively market Planet/Monex's DCC services to GCS' customers for the parties' mutual benefit. Planet/Monex taught GCS how to conduct DCC transactions by, among other things, transferring their valuable proprietary information to GCS. In return, GCS agreed to promote Planet/Monex's services to its customers and to share its DCC-related revenue equally with Planet/Monex. Instead, GCS, through its then-president, Mark A. Silverman, diverted DCC-related business to his current employer, Dynamic Currency Conversion, Inc., ("DCCI") and only reluctantly agreed – after a year of protracted negotiations – to pay Planet/Monex part of their share of the diverted business. And Nova, as successor to GCS' obligations, continues to use the DCC-related processes that Planet/Monex taught to GCS while at the same time it refuses to honor its payment obligations to Planet/Monex.

4. Nova's actions have harmed Planet/Monex financially, and Nova should be made to account to Planet/Monex for the harm that it has caused them.

<u>Jurisdiction and Venue</u>

5. This Court has jurisdiction over this matter under 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

6. Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1391(a) and (c) in that Nova is registered to do business in New York, and does business in this District.

## The Parties

7. Plaintiff Monex Financial Services Ltd. ("Monex") is an Irish corporation with its principal place of business at Killarney Technology Park, Killarney, County Kerry, Ireland. Monex is a leader in the provision of DCC solutions. Monex has developed an innovative approach to multi-currency credit and charge card processing and in particular in providing the DCC service and related systems at a cost of millions of dollars. Monex has operations in London, Dublin, Killarney (Headquarters), New York, Bangkok, Singapore, Dubai, Bahrain, Cape Town and Sydney, each serving to support its operations in these regions.

8. Plaintiff Planet Payment, Inc. ("Planet"), which also formerly did business under the name Planet Group, Inc., is a Delaware corporation with its principal place of business at 670 Long Beach Boulevard, Long Beach, NY 11561. Planet is a credit card transaction processor that enables banks to accept and process credit card transactions in multiple currencies, thereby allowing their merchant customers to provide localized pricing at the point-of-sale to foreign cardholders. Planet's services, including its DCC service, involve a complete technology solution, including point-of-sale devices and systems, communications, network interfaces, data processing, and reporting and reconciliation, which Planet has constructed at a cost of millions of dollars.

9. Planet and Monex conducted certain business together through a jointly-owned corporation named Planet Monex, Inc. ("PMI"). In particular, Monex, Planet and PMI entered into the Teaming Agreement with GCS under which Monex, Planet and PMI were to provide their DCC services to GCS's customers. PMI is not otherwise relevant to this action.

Global Card Services, Inc. ("GCS")

10. Until Nova's acquisition of GCS' assets, GCS had been a wholly-owned subsidiary of First Horizon Merchant Services, Inc., and operated a credit card processing business to enable merchants to accept credit cards. According to GCS' Internet website:

> Since 1994, GCS has provided its products and services to merchants in the Travel & Entertainment industry. Although GCS brings a complete understanding to the hospitality industry about the complexities of credit card acceptance for Travel & Entertainment merchants, our products and services provide solutions for all types of merchants, both virtual and physical . . . .

11. As noted above, on or about December 10, 2001, Planet/Monex entered into the Teaming Agreement with GCS under which the parties were to cooperatively market Planet's and Monex's DCC services to GCS's customers. Under the stated purpose of the Teaming Agreement, the "parties shall work together to develop the systems necessary to enable DCC services to be provided to their respective clients. The parties wish to work together to provide DCC services to GCS Merchants . . . ."

Nova

12. Nova is a wholly-owned subsidiary of U.S. Bancorp. Nova claims to provide integrated payment processing services to merchants and financial institutions in the United States, Canada and Europe. According to Nova, its payment products include credit and debit card processing, electronic check services, gift cards, dynamic currency conversion, multi-currency support, and cross-border acquiring. Nova claims to handle every aspect of the acquiring relationship, including transaction processing, risk and underwriting, settlement, equipment purchase and deployment, and customer service. Nova acquired the assets of GCS, and expressly assumed GCS' obligations to Planet/Monex under the Teaming Agreement.

## Background Facts

### Credit Card Transaction Processing

13. At the most general level, credit card transactions typically involve at least five parties: (1) the cardholder; (2) the bank or financial institution that issued the credit card (the "issuer"); (3) a credit card association (such as Visa or MasterCard); (4) the merchant selling goods or services to the cardholder; and (5) the bank or other financial institution with whom the merchant has contracted to permit the merchant to accept credit cards (the "acquirer").

14. A merchant that accepts credit cards for payment has previously contracted with an acquirer for an account that permits the merchant to accept credit cards issued by a card association. The merchant's account is denominated in a settlement currency, which is typically the same as the legal currency in the jurisdiction where the merchant is located. The currency in which the merchant receives payment is generally the same as the settlement currency.

15. For most U.S.-based merchants that do not use DCC, their customers make purchases in U.S. dollars, and the transactions are settled (*i.e.*, payments are made into the merchants' accounts) in U.S. dollars. In such cases, the card association converts a non-US dollar cardholder's transaction into the currency in which the credit card is issued before submitting it to the issuer for billing to the cardholder, via his credit card statement.

16. The cardholder cannot determine the final amount of the transaction in his local currency at the time of the transaction, but rather learns the amount of the transaction in the issuing currency only upon receiving his next billing statement. The cardholder does not have any opportunity to reject the conversion itself or choose some other institution or entity to provide the currency conversion, or to pay in his own currency.

Monex's Business

17. Monex has developed an innovative approach to multi-currency credit and charge card processing. Monex's system offers a new revenue stream through the currency conversion process and thus provides a profitable means of accepting and processing foreign cards – an added value service to merchants. Monex's solution is highly automated and thus highly merchant friendly. Once card details have been entered, the system automatically identifies the card-issuing bank, country and currency of issue of that card. The system applies an appropriate composite foreign rate to the transaction, incorporating into the "spread" a margin representing charges similar to those which would typically be levied by the card scheme and the card issuing bank. The system then presents the customer with a transaction for approval in his home currency. The system also specifies a local currency amount, a proposed foreign exchange rate, and home currency amount.

Planet's Business

18. Planet specializes in the provision of multi-currency processing in order to provide localized pricing for transactions using a credit card. Planet's business is focused on powering acquirers and processors, enabling them to facilitate localized pricing by merchants across a broad range of industry sectors, whether in face to face, mail order/telephone order or Internet-based transactions. Planet works with many leading point-of-sale solutions providers and gateways to provide seamless solutions for merchants who are working with multiple locations in multiple jurisdictions and with different acquirers.

19. Among the services offered by Planet are: (1) dynamic currency conversion services; (2) global payment solutions that enable the merchant to consolidate all of its global

payment processing requirements into one efficient solution; and (3) multi-currency processing services that enable merchants to quote specific prices in one or more foreign currencies.

The Teaming Agreement

20. Planet, Monex, PMI and GCS executed the Teaming Agreement on December 10, 2001. Under the stated purpose of the Teaming Agreement, the "parties shall work together to develop the systems necessary to enable DCC services to be provided to their respective clients. The parties wish to work together to provide DCC services to GCS Merchants . . . ." Despite the cooperation specifically envisioned under it, though, the Teaming Agreement states that "[n]either party shall in any way infringe upon the intellectual property rights of the other."

21. Although DCC is known in the credit card processing industry and is not necessarily unique to Planet/Monex, the specific manner in which Planet/Monex implement their DCC services is based on confidential, proprietary innovations which Planet/Monex developed. The proprietary information is disclosed to Planet/Monex's customers – such as GCS – to enable the customers to implement Planet/Monex's DCC services for their own customers. Without this proprietary information that Planet/Monex supply to their customers, the customers would not be able to conduct Planet/Monex's DCC.

22. The Teaming Agreement is at its core an exclusive arrangement between GCS and Planet/Monex under which Planet/Monex taught GCS how to conduct DCC transactions in exchange for GCS giving them entrée to GCS' customer base. Before GCS first began transacting business with Planet/Monex, GCS was generally unfamiliar with DCC services, and was completely ignorant of how it could actually implement a DCC service for its customers. Through the provision of their proprietary information to GCS, Planet/Monex schooled GCS in how to conduct DCC transactions so that GCS could claim, as it now does, that:

> For nearly ten years Global Card Services has supported the international processing requirements for the cruise industry. Those traditional requirements, combined with the real-time switching capabilities necessary to support a multi-processor environment, led to a natural evolution of product capabilities to support the international merchant and the emerging Dynamic Currency Conversion services now available.

GCS neglects to mention, though, that its "natural evolution" to DCC is based on proprietary information that Planet/Monex shared with GCS under the terms of the Teaming Agreement.

23. So under the Teaming Agreement, in exchange for teaching GCS how to conduct DCC transactions, GCS was to actively promote Planet/Monex's DCC services to its customers, and Planet/Monex were to share in all DCC-related revenue received by GCS, whether or not they were involved in the processing. With Nova's assumption of the Teaming Agreement, and its instruction that Planet/Monex "view Nova as the obligor under the Teaming Agreement," Nova likewise contracted to share equally all its DCC-derived revenue with Planet/Monex, again irrespective of whether or not Planet/Monex were involved in the DCC processing.

24. The initial term of the Teaming Agreement was five years (and so expired on December 10, 2006), but the Teaming Agreement expressly provides that "the parties shall continue to process transactions for merchants whose business is procured under this Agreement after the initial term of this Agreement, upon the terms and conditions set forth in this Agreement as long as the merchant continues to use the GCS . . . Products." So under the Teaming Agreement, Nova is obligated, but has refused, to share with Planet/Monex DCC-related revenue for those customers for whom GCS and Nova were providing DCC services before the expiration of the Teaming Agreement who still continue to do business with Nova. In sum, GCS (and now Nova) agreed to continue to share revenue with Planet/Monex for those DCC-related customers procured before the expiration of the Teaming Agreement whether or not Nova continued to use

proprietary DCC-related information derived from Planet/Monex, Nova still apparently does use that proprietary information, but it nevertheless refuses to honor its payment obligations to Planet/Monex.

Planet/Monex Perform Under the Teaming Agreement

25. Promptly after the execution of the Teaming Agreement, Planet/Monex set about fulfilling their obligations by providing their proprietary information to GCS to enable GCS to provide Planet/Monex's DCC services to GCS's customers. GCS knew that Planet/Monex were providing GCS with proprietary information under the Teaming Agreement, and agreed to use it only in connection with GCS' performance under the Teaming Agreement.

26. Monex also advanced $150,000 to GCS under the Teaming Agreement to assist it in paying for the necessary changes to GCS' systems to accommodate the DCC services. Without the provision of the proprietary information by Planet/Monex, GCS would not have known what changes to make to its systems to accommodate the DCC services or how to make those changes.

27. Not long after the signing of the Teaming Agreement, the parties secured Royal Caribbean Lines ("RCCL") as a customer of GCS to use the DCC service provided by Planet/Monex. GCS and Monex each signed contracts with RCCL for the DCC service in or about August 2002, and Monex began providing DCC services to RCCL in September 2002. By November 2002, the DCC service was fully implemented with RCCL. In accordance with the Teaming Agreement, Monex duly paid GCS, and then Nova, its 50% share of the DCC-related revenue from the inception of the DCC services it provided to RCCL until September 2006, when RCCL contracted with Nova and another DCC service provider (and Nova wrongly stopped the payments to Planet/Monex, as described below).

28. Also after the signing of the Teaming Agreement, GCS appeared to work with Planet/Monex to secure Princess Cruise Lines ("Princess") as a customer for Planet/Monex's DCC service. But GCS' then-president, Mark A. Silverman, conspired to steer the business to his current employer, DCCI, and Princess contracted with GCS and DCCI instead of Planet/Monex, although GCS continued to use the DCC processes taught to it by Planet/Monex. Although it initially wrongfully declined to do so, GCS began to pay Planet/Monex their 50% share of the DCC-related revenue received by GCS, as expressly provided in the Teaming Agreement, but even these payments did not fully compensate Planet/Monex for the business that Silverman diverted. GCS, and then Nova, continued the payments for the Princess business – as they were contractually bound to do – until December 2006, when Nova wrongfully ceased the payments in breach of the Teaming Agreement.

29. And just as GCS and Nova had done with the Princess business, when RCCL contracted with another DCC service provider in September 2006, Nova should have begun paying to Planet/Monex their 50% share of the DCC-related revenue that Nova received, but Nova has failed and refused to do so, in breach of the Teaming Agreement. Nova's pretext for failing to pay Planet/Monex their share is the claim that RCCL contracted with another DCC service provider only after Planet/Monex were supposedly unable to adequately service RCCL's requirements. The falsity of Nova's claim is shown by the fact that RCCL never asked Planet/Monex for any additional services or complained about the adequacy of the services being provided by Planet/Monex, and by the fact that Nova did not – as it was contractually required to do under the Teaming Agreement – make a reasonable effort to convince RCCL to continue to use the Planet/Monex DCC solution.

30. The Teaming Agreement expired on December 10, 2006 "with regard to new business." But the Teaming Agreement expressly provides that, despite its expiration for new business, "the parties shall continue to process transactions for merchants whose business is procured under this Agreement after the initial term of the Agreement, upon the terms and conditions set forth in this Agreement as long as the merchant continues to use the GCS . . . Products" (*i.e.*, the services that GCS/Nova continue to provide to customers, including RCCL and Princess, as defined in the Teaming Agreement) Included among those terms is GCS' (now Nova's) obligation to pay Monex and Planet "50% of the DCC revenue derived by GCS" for DCC business done by GCS that excludes Planet/Monex – *i.e.*, the DCC-related business that Nova continues to conduct with RCCL and Princess and any other merchant that Nova obtained for DCC services before the expiration of the Teaming Agreement. Nova refuses to fulfill this contractual commitment, even as it continues to use the proprietary DCC-related information that Planet/Monex provided to GCS.

31. Planet/Monex have made demand on Nova that it fulfill its contractual obligations that it assumed under the Teaming Agreement by continuing to pay them the funds that it owes for the RCCL and Princess DCC-related business, and for the other DCC-related business conducted by Nova. Using the December 10, 2006 expiration of the Teaming Agreement for "new business" as a pretext for halting the payments, Nova refuses to pay to Planet/Monex the money that it owes them, although Nova continues to use the proprietary information obtained from Planet/Monex to provide services to the very customers that they first introduced to GCS.

### FIRST CLAIM FOR RELIEF

32. Planet/Monex incorporate paragraphs 1 through 31 hereof by reference as though fully restated herein.

33. The Teaming Agreement constituted a legal, valid, binding and subsisting contract between GCS and Planet/Monex, which was fully assumed by Nova.

34. Planet/Monex fully performed their obligations under the Teaming Agreement.

35. As described more fully above, Nova breached the Teaming Agreement by, among other actions, diverting the Princess DCC-related business to DCCI, failing to use reasonable efforts to convince RCCL to continue its contract with Planet/Monex and by failing to pay Planet/Monex amounts due to them under the Teaming Agreement for RCCL and Princess DCC-related revenue.

36. Planet and Monex have been damaged by Nova's breach of the Teaming Agreement in an amount to be determined at trial, but not less than $1,000,000.

### SECOND CLAIM FOR RELIEF

37. Planet/Monex incorporate paragraphs 1 through 36 hereof by reference as though fully restated herein.

38. The Teaming Agreement constituted a legal, valid, binding and subsisting contract between GCS and Planet/Monex, which was fully assumed by Nova.

39. Planet/Monex fully performed their obligations under the Teaming Agreement.

40. The Teaming Agreement provides that "if GCS signs business for DCC that excludes Planet Payment then GCS shall pay Planet Payment 50% of the DCC revenue derived

by GCS." After it expressly assumed the Teaming Agreement, Nova stood in the stead of GCS for all purposes under the Teaming Agreement, and should have paid Planet/Monex 50% of Nova's DCC business that excludes Planet/Monex.

41. As described more fully above, Nova breached the Teaming Agreement by failing to pay Planet/Monex these amounts due to them under the Teaming Agreement.

42. Planet and Monex have been damaged by Nova's breach of the Teaming Agreement in an amount to be determined at trial.

WHEREFORE, Planet/Monex demand entry of a judgment against Nova as follows:

(a) awarding Planet/Monex actual damages in an amount to be determined at trial, but not less than $1,000,000;

(b) awarding Planet/Monex their costs, reasonable attorneys' fees, and disbursements in this action; and

(c) awarding Planet/Monex such other and further relief as is just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for all issues triable to a jury.

Dated: June 20, 2007
New York, New York

ABELMAN, FRAYNE & SCHWAB

*/s/ Richard L. Crisona*
Jeffrey A. Schwab (JS 9592)
Richard L. Crisona (RC 2203)
666 Third Avenue
New York, New York 10017
(212) 949-9022

Attorneys for Plaintiffs